Good morning. My name is Mark Bayless. I'll be arguing on behalf of the appellant, Carl Chester, this morning. If I may, I'd like to start off — I intend to get into the sentencing issues at some point, but I would like to point out to the Court the Brady-Jinks issue that I raised, because I think it has a uniqueness to it that the Court needs to understand. What issue was that? The Brady-Jinks argument that I raised in my brief. Apparently, the defendant was able to obtain a copy of a tape-recorded statement between the confidential informant in his case, Lamont Adams, and another undercover officer while they were waiting for a drug buy in another unrelated case. We — in the briefs, we call it the Hall case. And Mr. Hall was represented by the Federal Public Defender's Office. During the conversation, the tape-recorded conversation, a nickname for my client is Wicked, and that's been acknowledged by all the parties. It says, Wicked just hit that lick, and he is on his way back. And that's what Lamont Adams is saying to the undercover agent. This becomes relevant, as the Court will recall, in that the district court allowed under 404B, the prosecution, after my client testified regarding an entrapment defense, to bring in, on August 5, 2006, what we termed as a pretextual traffic stop, whereby they were able to seize from my client $10,000 in currency, have a drug-sniffing dog say that there's cocaine on this drug, and they used it to show knowledge. That was the government's premise for allowing this evidence in. As a matter of fact, we found out that it was Lamont Adams who tipped off the law enforcement that my client was coming back from California during this time frame, and that's why it's our position they pulled him over. In the same tape recording, it goes on to say that Wicked was on his way back, and he just got to do his money, and not dope. If you can tell, reading the transcript from this case, there's a lot of street vernacular or street slang used throughout the case. There's terminology such as cool, which means, according to street slang, I'm not going to do it, floss, which means that you appear to have a lot of money, clothes, things of that nature. And the term wick, under street slang, means larceny, thievery, things of that nature, but doesn't mean drug deals. And the reason that this constitutes Brady material, as opposed to just being a jinx violation, which the prosecutor in the lower court said it probably was a jinx violation that she did not turn it over to the defense, is because it could have been used as impeachment against Detective Yeager, who was the canine officer. His whole point of coming into court was to testify that that drug, that $10,000 currency, was drug money. That was the point of having him waiting out there, bring him into the scene, have his dog sniff the money, and testify. But it wasn't just the money that he sniffed, was it? He also sniffed the car. I mean, according to the testimony. Everybody I gather acknowledges that every, all, this was news to me, but I gather that if you sniff any money, there could be cocaine on it. And that was an ancillary argument that I made. The trial counsel didn't object to the officer giving this expert testimony about drugs being on the money. I mean, I clearly stated it was plain error. Again, I understand that they used an entrapment defense in this case, but clearly, the officer was not qualified to give that type of testimony as to trace amounts versus detectable amounts on money, and that his dog only can determine detectable amounts. What was the importance of this 404B testimony anyway, given everything else? According to the prosecution, they initially raised it before the trial. They wanted to bring a prior bad act of 2005 about my client being around quote-unquote Jim Jim's house in Lamont Mills' testimony. And they brought all that in, and the evidence has nothing to do with that. And then my client presents an entrapment defense, and the prosecution re-raised her 404B argument, saying it would go to the issue of knowledge. Now, remember, this occurred six weeks after the fact. They found no drugs in the vehicle, and the testimony was brought in that when the lawyer came in, the victim was not well, and she was not well. And the prosecution said, well, we're going to have to have a sniff. And they said, well, we're going to have to have a sniff. But all of these are reasons why it probably had a very no impact on the conviction anyway. Oh, I disagree. I totally disagree. I did not believe the evidence in this case was overwhelming at all. You have Lamont Adams, the only person. You got to remember what's going on here. Lamont Adams is sitting in the county jail. He's been arrested for state drug charges, and he contacts the DA and says he wants to start working off his cases. And how you work off your cases, the more people you turn in, the better deal you get. And in this case, his expectation was he wasn't going to be prosecuted in the state court, and it's, if I understand the record correctly, he was on parole in California, and they were going to write a favorable recommendation to him to whoever he was on parole. I believe it was California. So, again, and the reason that this is relevant is because it goes to the issue of knowledge. If you look at this record, there is nothing in my client's background to show he was ever involved in drugs. If you look at his numerous or some testimony that Adams had stolen drugs from him before, bought drugs from him before. Adams, if you really look at his testimony, and I cited it in my reply brief, what he says is they asked him, why did you give the police Mr. Chester's name? And it's because he said he purchased such large amounts from Tracy Davis at Jim Jim's house. He also said, I bought drugs from him. Did he not? I don't again, I will defer to the Court's memory on the transcripts, but I cited it to the Court, that portion in the transcript, which I thought tested. I thought Adams, I thought there was evidence submitted that Adams first met with the defendant when Adams was, or when they were selling drugs, previously seen the defendant buy drugs, previously bought drugs from the defendant. I thought all that was in the record.  I saw where he was saying he was selling drugs, smoking marijuana, hanging out at Jim Jim's house, okay? And then when the police officer at trial, or when the prosecutor at trial asked him, why did you believe Carl Chester was selling drugs? It was his testimony, and that it was because he bought such large quantities of drugs, not just rock, but large quantities from Tracy Davis. And that's why he gave the law enforcement my client's name. That was my understanding in reading the transcript. I may ask you another question, which is somewhat related, but just a little bit. How do you distinguish your case from Romero v. The United States? It seems to me that Romero v. The United States, very similar circumstances, very similar situation, and here we are. And I remember Romero was cited by the government in their briefs. I don't remember the underlying facts of the Romero case. All right. It's a 282-Fed Third. To go back to your Brady thing, even if you read the statement the way you're reading it, it doesn't corroborate your client's story, which was not that he was – that he'd stolen anything, but that he had just sold this car. His testimony was that he had sold his vehicle for $8,000 and that he had sold another piece of a stereo equipment for $2,000, and that the $10,000 was unrelated to any drug. And that absolutely was – But not that he had just hit that lick, i.e., on your reading, that he stole something. No, no, no, no. What I'm saying to the Court is Lamont Adams admits. That's Lamont Adams' testimony that when he says, I just – he's coming back from California, and it's Lamont Adams' own words that are saying that this is not – the $10,000 is not a result of drug money. It's a result of whatever street slang you want to term it, larceny, thievery, that type of thing. But it's not a result of drug money. But that was the reason the judge let it in, is that the prosecution was going to use it to show that the drug – the money was a result of drugs, and it was to show knowledge to rebut the defendant's entrapment defense. Well, frankly, the judge didn't let anything of this in until the entrapment, correct? Until he raised the entrapment defense. Until the entrapment defense. And then the judge finally allowed the rebuttal evidence relating to this August 15, 2006. August 5, 2006 incident. That is correct. Before I – this has happened to me the last time I spoke before the Court. I'd like to go on to another argument that I feel – again, this is somewhat of a unique argument. I don't know if the Court's been presented with this argument before. But in this particular case, my client was found to be a career offender. And his base-level offense as a result of being a career offender was at a level 37, where he was, if I recall, at a level 37, 360 months to life. And that's as a result of being a career offender. And as the Court is aware, the criteria for being a career offender is 4B1.1a. You have to be 18 years of age. The incident offense has to be a crime of violence or controlled substance. And you have to have two prior felony convictions. And then 4B1.2a.1 defines where the crime of violence is, and it has to be punishable by imprisonment for a term exceeding 1 year. Okay. We have this Wobbler problem, which is kind of interesting. Is that what you are talking about? I'm sorry? It's the Wobbler issue, the one that's – let me just. As a predecessor to it, how much difference would it make if he were not a career – if the Wobbler were actually a misdemeanor, he wouldn't be a career felon, is that right? That is correct. And how much difference would that make in the sentence? And here's where we get to the second part of my sentencing argument, where I'm maintaining to the Court that it was a significant procedural error. And the second – if it's 166.440 grams of crack cocaine, he would have been at a level 34, and the level 34, and assuming he had a criminal history of sex, he would have been 262 to 327. However, it's my – He got 264. He got 264. But here's the second part to the argument on the significant procedural error under Gall and Cardi. In the indictment, they charge him with cocaine, also known as crack cocaine. And under Apprendi, as we're all aware now, you have to charge it, you have to prove it beyond a reasonable doubt, and the jury has to find it, if that's my correct reading of Apprendi. In this particular case, they charged it. At trial, there was no jury instructions that I can recall defining what cocaine base is. It was just part of the instructions. You have to find cocaine base, also known as crack. This is the part that I think. But when you look at the special verdict form, onto each count, here's where it reads, the jury found 5 grams of mixture or substance of a detectable amount of cocaine base. The jury did not find crack cocaine. Now, if you take 166.40 grams of cocaine and apply it to the sentencing guidelines, you're at a level 18 as opposed to a level 32. Assuming argue, when do you take the jury have to determine that the drugs were cocaine based? No. The jury had been the chemist testified that crack and rock were the common names for cocaine base. The witnesses testified the drugs were crack cocaine or rock cocaine. The defendant testified the drugs were crack cocaine. The jury was instructed that cocaine base equals crack cocaine. Okay. What did the jury find? Cocaine base. And what does Hollis say? And what does Hollis say? Hollis says that's. But it was harmless. So why does it say? That's right. Well, wait, wait. How is mine harmless, though? Let me. If you go to a level 18, which would be cocaine. Harmless because everybody understood that it was actually crack cocaine. That was the reason. I don't, again, I don't believe that's the case here. Why? Because harmless, if, well, to trigger the enhanced statute, the jury was required to find crack cocaine. Here's the fundamental flaw in the government's argument, because you're basically that's the government saying. The only reason I have is I have your argument, and then I have versus the government's argument. So I put them all down. I appreciate that. And what I'm saying to the Court is here's the flaw in the government's argument. And I hope I hit it. All crack is cocaine base, but not all cocaine base is crack. Right. But Hollis is exactly the same. Yes. That is, they agreed with you about that, but then went on to say various witnesses testified without contradiction that the drugs the cooperating witness testified from Hollis were crack. He did not dispute a trial, his objections to the VSR report or sentencing the fact that what he distributed was crack. So it's true here as well. But we are disputing it. We are disputing it. Understand, I was not called. You're disputing it now, but you didn't dispute it during the trial. Well, I was a trial counsel. I understand that. You better go to another argument. That's the Hollis is right on point here. But it's not harmless. That's what I'm saying to the Court. The Court, Hollis is not harmless. I mean, this case is not harmless error because there was not, just because it's undisputed, I cited to the Court what you have to show is cocaine base. I cited, because I tried to get, okay, an expert appointed so I could analyze the drugs. And let's go to that argument. I tried to get it. I tried to ask the Court in the lower court, after I got appointed, he let the trial counsel out before the sentencing, and I came in. And I said to the district court, I need an expert for purposes of sentencing. I need to establish whether, you know, because certainly for purposes of impurity and quantity is an issue. And the judge said basically what you just said. You know what? We had trial testimony. The government's expert, Mr. Borderline, testified it was crack cocaine, and you don't need an expert to dispute that because it was uncontroverted at the time of trial. And I absolutely needed an expert to dispute because of what's happening to me today. It's not harmless error. I should have been entitled. That's kind of the effect. To have experts to analyze the weight and quantity, at least for the purposes of sentencing. Let's go to the other part of this. I mean, it seemed to me, frankly, that your strongest single argument is the one about the felony and the misdemeanor, but it doesn't seem to matter. Is that the problem? I mean, she robbed my question right out of my mouth. That's exactly where I was. Exactly. That's your strongest argument. My strongest argument, but now I have to address the harmless error aspect of that strongest argument. And, you know, without conceding anything, I am telling you this should have been a level 18 as compared to a level 32 because the jury did not find crack cocaine. But addressing the Court's question, the district court started at a level 37, 360 months to life. That was their starting point. Okay? Now, we know under Gall and Cardi, correctly, accurately determining the sentencing guidelines is critical. Then we go to the next question. So we know there was a procedural error here, but was it significant? That's the real question you're asking me. If there was. We're not suggesting. It's not clear that there is, but it's not clear if there was. We've not suggested it absolutely is. All we're saying is, okay, what's the difference? The difference is then when he applied, before he applies the second part, whether this under Gall and Cardi, you don't get to the second step if the first step. I see. You said there was a procedural error and that we can't know whether it was harmless or not because maybe it would have gone down from whatever that result was. We don't know that it would have gone to the 260-month sentence. All right, so let's quickly back up to the issue, which is, this is how I understand the record on that question. The probation report clearly said that it was going to be treated as a gross misdemeanor, but the judgment called it a felony, and the district court, in this case, essentially said, well, it says it's a felony, so it's a felony. And you say, but the actual sentence wasn't a felony sentence. So we would have to find a district judge clearly erroneous, and we would have to find him clearly erroneous on the ground that it was, even though the judgment says it was a felony, it wasn't a felony. And you can find them clearly erroneous because as a matter of law, by Nevada State statute, it cannot be a felony. A gross misdemeanor is up to one year in the county jail. A felony is a year or more in the Nevada State prison. A year or more or more than a year. Huh? A year or more. In other words, in Nevada, we have what are called truth in sentencing, and what it is, we now get a range if it's a felony. You don't you get a minimum range, let's say 12 months, and a maximum range of 30 months, which means you can't get you cannot get out before your minimum range and you expire at your maximum. So what do we know about the actual sentence? Huh? What do we know about the actual sentence here? The actual sentence, and I believe, and I apologize, I didn't bring the judgment conviction to the podium with me, but it's my recollection that it says a category of a felony, but it sentences them to 12 months in the Clark County Detention Center. So the judgment says 12 months in the county jail, and that's also in the PSR. The PSR says 12 months in the county jail. PSR. Right. Thank you. We'll take a rebuttal. May it please the Court. My name is Jeffrey Tao for the United States. There are a couple of points I want to clarify based upon the Court's questions to opposing counsel. As to what the PSR said, actually, I this is not in the excerpts, but what I have is the addendum to the pre-sentence report, which does, in which the pre-probation officers said that a review of the certified judgment and conviction order reflects that the Nevada State Court was very specific and listed this conviction as a Class D felony. The defendant is a career offender and, therefore, no changes were made. So the probation report was consistent with what the district court did. No, no, I'm sorry. The probation report in the earlier case. Oh, yes, Your Honor, but nonetheless, the district court did not say that. That clearly has to be treated as a gross misdemeanor. It said clearly. Right. Now, the district, the judge could have rejected that, but it doesn't look much like he did because the sentence seems to have been a misdemeanor sentence. So that's the question. Yes, Your Honor, but the only thing the Court could go by was the judgment and conviction, which really reflects what the sentence was. Yes, and what was the sentence? The sentence was 12 months, Your Honor. In jail? Yes. And is that not so – so is the – is that a misdemeanor sentence in Nevada? As I understand Wobblers and defense counsel, I do not practice state law, so he may be more familiar with this. It's my understanding is that had the Court designated it as a felony, then it would – then it would – as a gross misdemeanor, then it would have been a gross misdemeanor. I'm not understanding what you're saying. Is it possible in Nevada to be sentenced on a felony to 12 months in county jail? I do not know the answer to that, Your Honor. I do know that the judgment was clear in what it said. And that – It was – it either was or wasn't, depending on the answer to that question. If the answer to the question is that you – that under Nevada law, if you're sentenced to 12 months in county jail, that it is a misdemeanor, then the heading is just wrong. However, Your Honor, I would note that the approach that would have resolved this would have been for the defense counsel to go back to the State court and amend the judgment. And at the beginning of the sentencing hearing, the Court gave the defense an opportunity to make sure that the paper was in order. Against counsel's advice, the defendant decided to go forward with the hearing. So the only paperwork that the – that the Court had before it at the time was a judgment stating that it clearly was a Class D felony. Is that judgment in the record? It is in the record. It is not in the excerpts as far as I understand it, Your Honor. Okay. And do you – and you don't know the answer to the question. I would have thought that a felony had to be, what, a year and a day. Ordinarily, that's a felony. Well, I think that's true in Nevada? Again, Your Honor, not practicing State law, I do not know the answer. However, I would imagine that the answer is that it would depend upon the maximum sentence. And here, depending upon how it's designated, the maximum sentence could be higher. Yes, but I'm asking you whether in Nevada a felony can be a sentence of 12 months as opposed to 12 months and a day. Your Honor, I do not know the answer to that. And you don't know whether it can be in county jail as opposed to in prison? I do not know. Okay. And what about the harmless error question relating to all this? Suppose – let's suppose the crack cocaine stands the way it is, and this would have led to a sentence that was around what he actually got. Would it be harmless error or not? That would be our position, Your Honor, for a couple of reasons. First of all, not only did he sentence him well below the career offender guideline, he sentenced him to the low end of what the – what that range would have been below the career offender guideline. Here, the low end would have been 262. He was sentenced to 264 months. Moreover, the – in the court's analysis of why he reached that sentence, it's clear that he wasn't starting at a really high level and going backwards. He picked a number that was well below it for the purpose of being below the career offender guideline. But wouldn't this be a procedural error in the current lingo? I mean, in other words, if in fact he calculated the guidelines wrong, wouldn't we just have to go back? I would disagree only because of the way the court approached it. It was clear that regardless of whether he had been calculated as a career offender or not, he was going to go with the 262-month sentence – 264-month sentence. He said that? It's – unfortunately, I'm at a loss because the record was supposed to be shipped to me today, and from what I understand, it's supposed to be – it's actually probably arriving right now, and that was a mistake on my part. But nonetheless, from my recollection of reading that part of his arriving at the It wasn't so much that he was picking a number and going backwards. He was picking a number that he thought was an appropriate sentence, and he was making a point not to do it within the career guideline range. It doesn't do a lot of good to show up without having read the record. I apologize, Your Honor. I can think of what I was – the portion where I'm talking about, but there was a mix-up in the FedEx, and that is completely my fault. I apologize. I certainly intended to have the whole record before me right now. Is there anything else you want to address? Yes, Your Honor. As to the – as to the car stop issue, I just wanted to make a clarification. In admitting that, it was, again, after the government's case in chief, and the reason it was admitted was both for knowledge, but also because during his testimony, appellant testified essentially that he was so impoverished that he was ripe for the entrapment. And he talked about how he had no job, no income, and he was only gambling, and yet he was driving around with $10,000 of cash in. And on page 624 of the record, the basis for the – for putting forth the evidence of the car stop was both to show knowledge and because the amount of the money, too, he testifies he did not have a job at all, creates an inference that with these large sums of money, dot, dot, dot, and then the court interrupts. So there were multiple bases for introducing the car stop evidence. Well, what about the Brady point, though? The Brady point, Your Honor, it was not a Brady violation for a couple of reasons. First of all, it wasn't – it was not exculpatory at all. It was actually completely inculpatory because it – even if it was believed, it told a story that was completely different than what the defendant said on the stand, as you pointed out. His story was that he sold his car for – and got the money, and yet even if what – if the transcript that he's referring to is to be believed, then he stole the money, and that's completely inconsistent with what he said. To the extent that Adams, who's a C.I., to the extent his testimony was – his credibility was at issue, it was laid forth before the jury squarely. He was cross-examined extensively about the fact that he was a paid informant and whatever biases he may have, and the Court made a point to instruct the jury to be extra careful in reviewing his testimony because of the nature of who he was and what he was doing. And one other point – factual point I wanted to clarify, Your Honor, is that one of the central points of Appellant's story was that Adams somehow was hiding the crack on his person, going to the deals, and coming back with the crack and pretending that the appellant had sold him the crack, and that was contradicted by the idea – by the fact that prior to each transaction, law enforcement patted down the C.I. so that he could not be hiding – hiding the crack on him. Does the record actually show that – does Adams say that, as we were discussing before, that Chester had sold him drugs before or just that he had – He does, Your Honor. There are two different portions within his testimony. In the first part of it, he testifies that he observed Appellant buying distribution amounts of crack. Later on, he's asked directly whether he ever bought drugs from Appellant, and he does say that he did. But that's the fact that – That's in the transcript on the first day of trial. Yes, it is, Your Honor, during Adams' testimony. And then – but the clarification I wanted to make is that in Appellant's reply brief, he makes a reference to Detective Calhoun saying that no one patted Adams down. What's not mentioned, though, is that later on in Calhoun's testimony, he clarifies himself when he realizes he misunderstood the question, and he's very clear that every time Adams was patted down prior to each transaction. I just wanted to make sure the record was clear on that, Your Honor. Other than that, unless the Court has any questions, I rest on the briefs. Thank you. Thank you. Yes, you may have one minute. You don't have to beg for it. Go ahead. To answer the Court's question, I'd refer the Court to Nevada Revised Statute 193.140, which defines the punishment for gross misdemeanor. And I'll just read a portion of it. Every person convicted of a gross misdemeanor shall be punished by imprisonment in the county jail for not more than one year. As far as a felony, in Nevada we have, if you're, let's say, a one to – minimum of one year, it's one to six, one to five, two to 15. Those are the types of what the statutes require. But the distinguishing factor between a felony and a misdemeanor is if you're sentenced to a felony, you go to Nevada State Prison. If you're sentenced to a – Is that in the statute? Is that in the statute? Because Idaho, we're not far from Nevada. And we sentence people to felonies all the time and give them prison terms as law in the county jail. And it's normal. And I'm trying to – I tried to find a Nevada statute that says you can't send them to the county jail. And there's a recent Nevada case that just came down from Nevada Supreme Court. Basically what's – in Nevada, you do a felony, you got to go to Nevada State Prison. What they've recently come down and said is – The statute that says that. Yes. It's the statute. But what they've come down and said is if you want somebody to go to county jail, you can make it as a condition of their probation. In other words, you send them to prison for 19 to 48 months, suspend it as a condition of their probation, you can put them in six months in the county jail. That's how – But, you see, what is clear from this record is that the judge rejected the plea agreement to the – at least to the degree that the plea agreement was for probation, and he didn't give them probation. No, no. The plea agreement – and, again, the way it reads in Nevada is they stipulated gross misdemeanor treatment. He was to get – I stipulated probation. Well, they stipulated the one-year probation. And the way it works in Nevada is not to exceed three years probation. In other words, on a gross misdemeanor, on a felony, it's not to exceed five years probation. When you read the pre-sentence investigation report, they put NTE three years, NTE five years. And then the court can sentence you in this particular case. You – You're saying when it says and one-year probation, that means in addition to. Right. In other words – That's what you're saying. Right. All right. You have one more sentence to get out. Go ahead. Okay. Just on the Romero case, if you're talking about the curative instructions, I did not believe the curative instructions were – prevented this from being harmless error, because I believe once the jury heard this testimony on the drug money that the government was impermissibly allowed the – or the drugs on the money that the government – that the curative – once the bell is rung, you can't unring it. Okay. Thank you. Are you appointed, counsel? Yes, I am, Your Honor. I want to say you've made a very spirited argument on behalf of your client. Thank you, Your Honor. Thank you very much. Thank you. The case of United States v. Chester is submitted and will air in recess until tomorrow. Thank you.
judges: Noonan, Berzon, Smith